# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 26

**OCTOBER TERM, A.D. 2024**

**March 5, 2025**

GEORGE KEVIN DICKERSON,

Appellant
(Defendant),

v.                                                                                    S-24-0154

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Joshua C. Eames, Judge*

*Representing Appellant:*
> *Office of the State Public Defender: Brandon Booth\*, Wyoming State Public Defender, Kirk A. Morgan\*\*, Chief Appellate Counsel. Argument by Mr. Morgan.*

*Representing Appellee:*
> *Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General, Samuel Williams, Senior Assistant Attorney General. Argument by Mr. Williams.*

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

\*An Order Substituting Brandon Booth for Ryan Roden was entered on October 10, 2024.
\*\*An Order Substituting Kirk A. Morgan for Robin S. Cooper was entered on December 16, 2024.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]   A jury convicted George Kevin Dickerson of second-degree murder and attempted second-degree murder. Mr. Dickerson appeals his convictions, claiming the district court erred in two of its instructions to the jury and in allowing the State to present evidence of Mr. Dickerson's past statement about one of the victims. We affirm.

## ISSUES

[¶2]   This appeal presents three issues:

1. Did the district court commit plain error when it instructed the jury on Mr. Dickerson's plea of not guilty by reason of mental illness or deficiency?

2. Did the district court commit plain error when it instructed the jury that it could infer malice from the use of a deadly weapon when the defendant pleaded not guilty by reason of mental illness or deficiency?

3. Did the district court abuse its discretion when it admitted evidence of Mr. Dickerson's prior comment about one of the victims following a *Gleason* hearing?

## FACTS

### I.   Background

[¶3]   In the early morning on January 8, 2023, Mr. Dickerson called 911 and told the dispatcher that he had killed his mother-in-law, Rose Dennis, and her husband, Andy Martin, with a kitchen knife. Two officers with the Casper Police Department arrested Mr. Dickerson in the parking lot where he made the call, while others responded to Ms. Dennis and Mr. Martin's home. At the home, they found Ms. Dennis still alive, and Mr. Martin deceased. Mr. Martin was determined to have died from multiple sharp force injuries, while Ms. Dennis suffered significant bruising on her face and neck, as well as several sharp force injuries to her neck.

### II.   Charges and pretrial proceedings

### A.   Mr. Dickerson's NGMI plea and examination

[¶4]    The State charged Mr. Dickerson with second-degree murder and attempted second-degree murder. Mr. Dickerson entered pleas of not guilty and not guilty by reason of mental illness or deficiency (NGMI). Mr. Dickerson's theory underlying his NGMI plea was that he had taken an accidental double dose of venlafaxine, an antidepressant, and that side effects from the medication had caused him to have a violent outburst and disconnect from reality to an extent that he was not criminally responsible for his actions.

[¶5]    The district court ordered a mental examination pursuant to Wyo. Stat. Ann. § 7-11-304(d) (2023). The designated examiner concluded that while Mr. Dickerson suffered from an alcohol use disorder and major depressive disorder, he did not have a mental illness or deficiency as defined by the NGMI statutes, and even if he did, his mental illness did not result in him lacking substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

## B.    The State's 404(b) notice and the *Gleason* hearing

[¶6]    Mr. Dickerson demanded notice of the State's intent to introduce evidence subject to W.R.E. 404(b). The State provided notice of its intent to introduce evidence of a conversation in which Ms. Dennis and Mr. Martin's family members, including Mr. Dickerson, discussed ongoing difficulties related to the couple's declining health and the need to move Ms. Dennis into an assisted living facility despite Mr. Martin's strong objections. The proffered evidence was that during this conversation, Mr. Dickerson suggested provoking Mr. Martin to the extent he would be removed from the home for a temporary mental health hold, at which time the family could move Ms. Dennis out of the home without incident. The State initially argued that the evidence was not subject to Rule 404(b) at all, and that the mere comment was not a prior bad act by Mr. Dickerson. Still, the State provided the district court with a complete analysis under Rule 404(b) and the procedure outlined in *Gleason v. State*, 2002 WY 161, 57 P.3d 332 (Wyo. 2002).

[¶7]    The district court held a hearing on the statement's admissibility. Both parties expressed skepticism that the evidence was subject to Rule 404(b), but otherwise presented arguments within the *Gleason* framework. The district court issued a written order and concluded that "[t]he proposed evidence would appear to fall outside Rule 404(b)." However, as the parties had done, the district court proceeded to analyze the evidence as though the rule applied. It determined that the State had offered the evidence for the proper purpose of showing Mr. Dickerson's motive for confronting Mr. Martin on the date of the charged offenses. The district court also discussed the relevant *Gleason* factors to determine whether the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, and made the following findings:

- While there is some discrepancy on when the alleged conversation occurred, the [c]ourt concludes that it is sufficiently clear based on the State's offer of proof that

2

the conversation occurred [and] that this factor weighs in favor of admission.

- Mr. Dickerson has pleaded not guilty and not guilty by reason of mental illness or deficiency and has, with respect to his not guilty plea, put at issue all necessary elements. This factor weighs in favor of admission.

- There is some other evidence available to show Mr. Dickerson's motive and intent to include Mr. Dickerson's statements to dispatch after the charged offenses. Indeed, the State concedes that there is at least "limited evidence" to show Mr. Dickerson's motive and intent notwithstanding the proposed evidence. This factor weighs slightly in favor of exclusion.

- Similarly, the proposed evidence would appear to be cumulative as noted above. However, it would not be "unnecessarily" cumulative. This factor weighs slightly in favor of exclusion.

- While the exact time frame when the alleged statement was made is not clear, even if the statement occurred weeks before the charged offenses, the [c]ourt would find that this factor weighs in favor of admission.

- As to the prejudicial nature factors, none of them would weigh in favor of exclusion. The alleged conversation was not "reprehensible," especially when compared to the charged offense. The conversation had no alleged victims. There was no conviction or even charges associated with the proposed evidence. And, based on the State's proffer, the State is not seeking to introduce the proposed evidence to show any character trait that Mr. Dickerson has or that he acted in conformity with any character trait on the date of the charged offenses.

Based on this analysis, the district court concluded that the evidence was admissible under Rule 404(b). However, the court conditioned its admission on the State advancing a theory that Mr. Dickerson was at Ms. Dennis and Mr. Martin's house on the date of the alleged offenses to carry out the plan described in his prior statement, because the evidence would otherwise be irrelevant.

3

### III.     *The trial and sentence*

### A.     **The testimony**

[¶8]   At trial, the State presented extensive evidence of the crime scene and the investigation that followed. However, because Mr. Dickerson did not deny killing Mr. Martin or assaulting Ms. Dennis, the focus at trial became whether Mr. Dickerson should be found not guilty by reason of mental illness or deficiency.[1]

[¶9]   The manager at Mr. Dickerson's pharmacy testified that prior to January 6, 2023, the pharmacy had filled Mr. Dickerson's venlafaxine prescription with 75-milligram pills, with instructions that he take two pills daily. However, on January 6, the pharmacy filled his prescription with 150-milligram pills with instructions to take one pill daily. Mr. Dickerson testified that on January 6, he picked up his venlafaxine refill and that, although the change in pills was reflected on the written instructions accompanying the pills, he was not verbally advised of this change. He explained that on January 7, he took two of the 150-milligram pills, unaware that the dosage of the individual pills had changed. He also explained that later in the day, he went out and picked up a job application before stopping at a bar for two double bourbons and two single bourbons before going back home for a nap.

[¶10]   Mr. Dickerson testified that when he woke up from his nap, he "had been having a very vivid and violent dream" that had been recurring for the previous several weeks. Based on this dream, he believed that Ms. Dennis needed help because of problems Mr. Martin had been causing with Ms. Dennis's home healthcare workers and cleaning staff. Mr. Dickerson explained that he remembered angrily getting into his car and driving over to Ms. Dennis and Mr. Martin's house. He testified that after arriving, he went to the bedroom, confronted Mr. Martin, and asked him "what the hell had been going on," to which Mr. Martin responded that it was none of Mr. Dickerson's business. According to Mr. Dickerson, Mr. Martin then approached him "in a threatening manner," and Mr. Dickerson struck Mr. Martin. After that, Ms. Dennis started "slapping at" Mr. Dickerson to try to get him to stop, and Mr. Dickerson pushed her to the side, causing her to fall between the bed and the wall. According to Mr. Dickerson, everything next happened "in flashes," and the next thing he remembered was washing his hands in the bathroom sink. Mr. Dickerson explained that after washing his hands, he paced around the house in disbelief for a bit before driving to his church, disposing of his clothing, and driving home, where he showered and went to bed but did not sleep.

---

[1] Mr. Dickerson also argued that if the jury declined to find him not guilty by reason of mental illness or deficiency, it should find him guilty of voluntary manslaughter rather than second-degree murder with respect to Mr. Martin based on Mr. Dickerson's claim that Mr. Martin approached him in a threatening manner.

[¶11] The examiner who conducted Mr. Dickerson's mental evaluation testified. Consistent with his report, he testified that in his opinion Mr. Dickerson did not have a mental illness or deficiency as defined by the NGMI statutes, and that Mr. Dickerson did not lack substantial capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. The examiner consulted with a psychiatrist and a pharmacist at the Wyoming State Hospital regarding Mr. Dickerson's medications and reviewed a report of Mr. Dickerson's bloodwork showing the drug levels in his system, and concluded that this information did not alter his opinion. The examiner explained that Mr. Dickerson's behaviors, particularly his efforts to conceal certain evidence and his eventual decision to turn himself in, suggested that Mr. Dickerson was in touch with reality, able to control himself, and able to appreciate the wrongfulness of his actions.

[¶12] The medical director at the Wyoming State Hospital supplemented this testimony. He explained that while in rare cases, venlafaxine can cause increased agitation, anxiety, delusions, hallucinations, and behavioral changes, individual reactions to any drug "are extremely variable and idiosyncratic," and that "unless you do genetic testing, you can't really know how one person is going to respond to a medication." He also explained that he had reviewed Mr. Dickerson's bloodwork, and although his levels of venlafaxine were higher than a "therapeutic dose," they were not high enough to cause concern about an overdose or other "serious problems."

## B.    The jury instructions

[¶13] Two instructions given to the jury are at issue in this appeal. The first concerned Mr. Dickerson's NGMI plea. The main concern of the court and the parties was crafting an instruction that conveyed that the voluntariness or involuntariness of Mr. Dickerson's intoxication, resulting from his venlafaxine consumption, was a question of fact for the jury. The parties and the court were also concerned with whether the court should define "involuntary" for purposes of this inquiry. Ultimately, the parties decided that no definition should be given, and the district court gave the following instruction:

> The defendant has entered a plea of not guilty by reason of mental illness or deficiency as a defense to the crime charged.
>
> Every defendant is presumed to be mentally responsible. This presumption does not apply if the Defendant proves by the greater weight of the evidence that he, as a result of mental illness or deficiency, lacked substantial capacity at the time of the alleged criminal conduct to either

5

appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

The terms "mental illness" or "deficiency" mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication. The terms do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Mental illness or deficiency can be brought about by the continued use of intoxicating liquor or drugs. Mental illness or deficiency can also be brought about by involuntary intoxication. That is, you may find that the Defendant's ingestion of an excess dosage of Venlafaxine resulted in a severely abnormal mental condition, resulting in mental illness or deficiency as defined above. In order to find that the Defendant's ingestion of Venlafaxine caused his mental illness or deficiency, you must find that his ingestion of an excess dosage of Venlafaxine was involuntary. The question of whether the Defendant's intoxication was involuntary is a fact question for the jury.

If you find from the greater weight of all the evidence that the defendant, at the time of the commission of the crime charged, as a result of mental illness or deficiency, lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law, then you must find him not guilty by reason of mental illness or deficiency.

If, on the other hand, you do not find from the greater weight of all the evidence that the defendant, at the time of the commission of the crime charged, as a result of mental illness or deficiency, lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law, then you must not find him not guilty by reason of mental illness or deficiency, and you must proceed to consider whether the State has proved beyond a reasonable doubt all of the elements of the crime charged, including whether the defendant acted with the

6

intent or other mental state required as an element of that crime.

[¶14] The other instruction at issue received minimal discussion at the jury instruction conference. It read:

> You are instructed that you may, but are not required to infer malice from the use of a deadly weapon. The existence of malice, as well as each and every element of the charge of Second-Degree Murder and Attempted Second-Degree Murder must be proved beyond a reasonable doubt.

## C.     The verdict and sentence

[¶15] The jury found Mr. Dickerson guilty of second-degree murder and attempted second-degree murder. The district court sentenced Mr. Dickerson to consecutive prison sentences of sixty years to life. Mr. Dickerson timely appealed.

### DISCUSSION

### I.     *The district court did not plainly err when it instructed the jury on Mr. Dickerson's NGMI plea.*

[¶16] Mr. Dickerson first contends that the district court's NGMI instruction was erroneous. Because Mr. Dickerson did not object to this instruction at trial, we review for plain error. *Iverson v. State*, 2025 WY 19, ¶ 13, 563 P.3d 496, 499 (Wyo. 2025) (citing *Lee v. State*, 2024 WY 97, ¶ 12, 555 P.3d 496, 499 (Wyo. 2024)). "To establish plain error, an appellant must show: '(1) the record clearly reflects the alleged error; (2) a violation of a clear and unequivocal rule of law in a clear and obvious manner; and (3) the appellant was denied a substantial right which caused the appellant material prejudice.'" *Iverson*, 2025 WY 19, ¶ 13, 563 P.3d at 499 (quoting *Kobielusz v. State*, 2024 WY 10, ¶ 24, 541 P.3d 1101, 1108 (Wyo. 2024)).

[¶17] The record shows the instruction was given to the jury, satisfying the first prong of the plain error test. However, the instruction does not violate a clear and unequivocal rule of law, and thus Mr. Dickerson's plain error argument must fail.

[¶18] The basis for an NGMI plea is Wyo. Stat. Ann. § 7-11-304. Subsection (a) of that statute provides:

> A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to

7

appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6-1-202(b).

*Id.* While the plain language of the statute prevents a defendant's self-induced intoxication from forming the basis for an NGMI plea, we have held that involuntary intoxication may serve as the basis for such a plea. *Poitra v. State*, 2012 WY 58, ¶¶ 11-14, 275 P.3d 478, 481-82 (Wyo. 2012) (holding that "involuntary intoxication is a statutory defense to a criminal charge in Wyoming," and that an NGMI plea is the only vehicle by which that defense may be pursued).

[¶19]   According to Mr. Dickerson, the district court's NGMI instruction in this case was erroneous because it "failed to tell a jury that one can voluntarily take something, but accidentally take an overdose, which would be considered 'involuntary intoxication.'" He cites the definitions of "involuntary intoxication" and "voluntary intoxication" from Black's Law Dictionary to assert that it is "a clear and unequivocal rule of law that involuntary intoxication can include ingestion of an accidental overdose without one's knowledge."

[¶20]   Assuming that Mr. Dickerson is correct that an accidental overdose is indeed "involuntary," the instruction in this case accurately instructed the jury that Mr. Dickerson's ingestion of an excess amount of venlafaxine could be involuntary. The instruction plainly stated, as agreed by the parties: "In order to find that the Defendant's ingestion of Venlafaxine caused his mental illness or deficiency, you must find that his ingestion of an excess dosage of Venlafaxine was involuntary. The question of whether the Defendant's intoxication was involuntary is a fact question for the jury." To emphasize Mr. Dickerson's theory, defense counsel argued in closing:

I want to briefly note in Instruction 11, self-induced intoxication, obviously he voluntarily took that second pill. Nobody forced it down his throat . . . . Yes, he misapplied his medication, but that was reasonable. He'd been taking two capsules for months and months and nobody told him, hey, we gave you 150 milligram this time instead of 75, you only take one. There's a label. There's a pamphlet. Common experience tells you most people don't read their labels on their refills.

8

[¶21] Defense counsel's argument made it clear that the NGMI instruction allowed the jury to determine that an accidental overdose could be involuntary. "Instructions are sufficient if they correctly state the law, they are not misleading, and they permit the parties to argue their respective theories of the case." *Kessel v. State*, 2023 WY 120, ¶ 20, 539 P.3d 406, 410 (Wyo. 2023) (quoting *Mitchell v. State*, 2020 WY 142, ¶ 32, 476 P.3d 224, 237 (Wyo. 2020)). Mr. Dickerson clearly presented the theory he now claims was obscured by this instruction, and we thus reject his plain error argument.[2]

## II. The district court did not plainly err when it instructed the jury that it could infer malice from the use of a deadly weapon.

[¶22] Mr. Dickerson next claims that the district court erred when it instructed the jury that it could infer the malice element of second-degree murder from the use of a deadly weapon. As with the NGMI instruction, Mr. Dickerson did not object to this instruction, and so our review is for plain error. *Iverson*, 2025 WY 19, ¶ 13, 563 P.3d at 499. This instruction was also given to the jury, and thus the first prong of the plain error test is satisfied.

[¶23] Mr. Dickerson argues that the instruction violates a clear and unequivocal rule of law because other states have held that while nothing prevents a prosecutor from arguing that use of a deadly weapon may give rise to an inference of malice, an instruction to that effect impermissibly emphasizes the inference on the part of the trial court. While Mr. Dickerson concedes that our past decisions have approved of this instruction generally, he attempts to distinguish his case based on his NGMI plea, which is "directly at odds with the charge because the defense is one where [the defendant] could be found not guilty in spite of a deadly weapon being used."

[¶24] We recently addressed a similar argument in *Hayes v. State*, 2024 WY 135, 560 P.3d 902 (Wyo. 2024). In that case, the defendant argued that he killed the victim in self-defense. *Id.*, ¶ 8, 560 P.3d at 904. The trial court gave an instruction identical to the one Mr. Dickerson challenges in the present case, save for the difference in charges. *Id.*, ¶ 11, 560 P.3d at 905. On appeal, the defendant claimed that his self-defense argument, which would negate the malice element of second-degree murder regardless of whether a deadly weapon was used, was directly at odds with the instruction. *Id.*, ¶ 17, 560 P.3d at 906. We acknowledged that our precedent left open the possibility of "cases where a court may decline to provide the instruction if it is unnecessary." *Id.*, ¶ 27, 560 P.3d at 909 (discussing *Hereford v. State*, 2015 WY 17, 342 P.3d 1201 (Wyo. 2015) and *Sam v. State*, 2017 WY 98, 401 P.3d 834 (Wyo. 2017)). However, because of the instruction's

---

[2] Because the NGMI instruction did not violate a clear and unequivocal rule of law, we need not consider whether it prejudiced Mr. Dickerson. *See Green v. State*, 2025 WY 20, ¶ 27, ___ P.3d ___, ___ (Wyo. 2025).

prior approval, and because of the lack of caselaw identifying the types of cases where the instruction would be unnecessary, we found no violation of a clear and unequivocal rule of law. *Hayes*, 2024 WY 135, ¶¶ 28-30, 560 P.3d at 909.

[¶25] We reach the same result in this case. Mr. Dickerson did not object to this instruction before the trial court, and thus we are limited to determining whether it was plainly erroneous. *Iverson*, 2025 WY 19, ¶ 13, 563 P.3d at 499. Though our prior approval of the instruction given in this case has not been in cases featuring an NGMI plea, *e.g., Hereford*, 2015 WY 17, ¶ 22, 342 P.3d at 1207, we also have no binding authority rejecting the instruction in this type of case and therefore can find no violation of a clear and unequivocal rule of law. In the absence of plain error in this case, any reconsideration of this instruction (in NGMI cases or otherwise) is a "task for another day." *Hayes*, 2024 WY ¶ 33, 560 P.3d at 910.[3]

### III.   *The district court did not abuse its discretion when it admitted Mr. Dickerson's prior statement about provoking Mr. Martin.*

[¶26] In his final argument, Mr. Dickerson challenges the district court's decision to admit evidence of his alleged suggestion that someone provoke Mr. Martin so that he could be removed from the home, giving the family an opportunity to move Ms. Dennis to an assisted living facility.[4] When a defendant demands notice of the State's intent to introduce such evidence, we review admission of the evidence for an abuse of discretion. *Santistevan v. State*, 2024 WY 17, ¶ 12, 542 P.3d 200, 204 (Wyo. 2024) (citing *Anderson v. State*, 2022 WY 119, ¶ 11, 517 P.3d 583, 588 (Wyo. 2022)).

[¶27] The pretrial procedure for admitting evidence under W.R.E. 404(b) is well-established in Wyoming. Once the State has filed a notice of intent to introduce such evidence, the district court must hold a hearing and conduct an "exacting analysis" of the four requirements for admitting such evidence:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must

---

[3] As with the NGMI instruction, because the district court's inference of malice instruction did not violate a clear and unequivocal rule of law, we do not consider whether it prejudiced Mr. Dickerson.

[4] Throughout the pretrial proceedings under W.R.E. 404(b) and *Gleason*, the district court and both parties expressed skepticism that Mr. Dickerson's statement is the type of evidence that mandates consideration under our established pretrial procedure. Still, the district court ultimately treated this evidence as 404(b) evidence and performed a full *Gleason* analysis. Because we find that the district court properly admitted the evidence under the structure of Rule 404(b) and *Gleason*, we assume without deciding that this evidence was within the scope of Rule 404(b).

> instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*King v. State*, 2023 WY 36, ¶ 20, 527 P.3d 1229, 1239 (Wyo. 2023) (quoting *Birch v. State*, 2018 WY 73, ¶ 19, 421 P.3d 528, 535 (Wyo. 2018)). To determine whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice, we have established an extensive list of factors for trial courts to consider. *Freer v. State*, 2023 WY 80, ¶ 13 n.3, 533 P.3d 897, 902 n.3 (Wyo. 2023) (listing the factors).

[¶28]  We do not repeat this analysis on appeal. *Id.*, ¶ 14, 533 P.3d at 902. "We instead 'determine whether the district court abused its discretion in considering the factors.'" *Id.* (quoting *Barrett v. State*, 2022 WY 64, ¶ 48, 509 P.3d 940, 950 (Wyo. 2022)). The trial court need not make express findings on each factor, and as long as there is a legitimate basis for the trial court's decision that is reflected in the record, we will not disturb it on appeal. *Freer*, 2023 WY 80, ¶ 14, 533 P.3d at 902.

[¶29]  By his own words, "[i]t is not the procedure itself that Mr. Dickerson now appeals but the district court's conclusion that the subject was not substantially outweighed by its potential for unfair prejudice." He contends that it is unclear when Mr. Dickerson made the statement, that Mr. Dickerson's alleged goal of provoking Mr. Martin was similar enough to his eventual actions that it would persuade the jury to improperly convict him, and that the comment had more to do with helping Ms. Dennis than hurting Mr. Martin.

[¶30] The district court considered the timing of Mr. Dickerson's statement, and it concluded that while the witnesses were somewhat unclear when exactly it was made, it occurred at the earliest in the weeks before the charged conduct. It also concluded that the statement was relatively benign when compared with the charged conduct, and thus was unlikely to encourage the jury to improperly convict Mr. Dickerson. As to Mr. Dickerson's contention that the evidence is more probative of his desire to help Ms. Dennis than his desire to hurt Mr. Martin, that is simply not a part of the W.R.E. 404(b) analysis and is outside the realm of the trial court's role in admitting such evidence. *See Freer*, 2023 WY 80, ¶ 13 n.3, 533 P.3d at 902 n.3 (Wyo. 2023) (listing the factors to consider before admitting 404(b) evidence). The district court's analysis reflects a careful consideration of the relevant factors, and we therefore find no abuse of discretion.

## CONCLUSION

[¶31]  The district court did not plainly err in instructing the jury on Mr. Dickerson's NGMI defense or in instructing the jury that it could infer malice from the use of a deadly

weapon. Nor did it abuse its discretion in admitting evidence of Mr. Dickerson's past statement about provoking Mr. Martin. We affirm Mr. Dickerson's convictions.